**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re Scott William Paavo
and Robin Lynn Paavo,

      Debtors,                          Case: 11-cv-10831
                                        Hon. Lawrence P. Zatkoff

Cornwell Quality Tools Company,

                                        Bank. Court Case No. 09-65854
      Plaintiff, Appellant               Adversary Proceeding No. 09-07072
v.                                        Hon. Marci B. McIvor, Bankruptcy Judge

Scott William Paavo and
Robin Lynn Paavo,

      Defendants/Appellees.
_____/

## I.  INTRODUCTION

      This matter is before the Court on appeal from a decision of Bankruptcy Judge Marci B. McIvor filed by Plaintiff Cornwell Quality Tools Company ("Cornwell") (Dkt #1).  The Court ordered Defendants/Appellees Scott William Paavo and Robin Lynn Paavo (the "Paavos") to file a response.  Complying with the Court's order, the Paavos have filed a response, and Cornwell has filed a reply. The facts and legal arguments are adequately set forth in the briefs submitted. Therefore, finding that the determination of the issues will not be aided by oral argument, and pursuant to E.D. Mich. L. R. 7.1(f), this Court ORDERS that the appeal be decided upon the briefs submitted, without this Court entertaining oral arguments.  For the reasons discussed below, Cornwell's appeal is DENIED.

## II. BACKGROUND

The Court provides the factual background as detailed by the bankruptcy court in the June

29, 2010, hearing on Cornwell's Motion for Summary Judgment and for Amendment of Pleadings:

Plaintiff Cornwell is a wholesale dealer of high quality tools and equipment intended for end use by mechanics and technicians who work on automobiles, aircrafts, and boats. Cornwell has franchised dealers in territories around the country. Cornwell's management structure includes regional and district managers operating under the direction of the company's headquarters in Wadsworth, Ohio.

Cornwell's business model is as follows. The Cornwell dealer purchases inventory from Cornwell at wholesale prices. The dealer's inventory is maintained on the dealer's truck, which is decorated with the franchise company's trademarks. The dealer establishes a regular weekly schedule of stops at garages, auto dealerships, and other locations where there are potential customers. The customers are usually extended ongoing unsecured lines of credit called time payment accounts, which they are expected to pay on every week.

According to Cornwell, the relationship between Cornwell and its dealers is relatively loose and noncontrolling. Within the broad terms of the dealer's obligation to meet minimum purchase levels . . . and to pay for those purchases, . . . the dealer is free to operate the business largely as he or she chooses. The Cornwell district manger is available to offer training and support but does not generally intrude into the dealer's business against the dealer's wishes.

Scott W. Paavo, Sr. entered the mobile tool industry in approximately 1998 as a dealer in northern Michigan for Matco, one of Cornwell's competitors. Scott W. Paavo, Sr. was a Matco dealer from 1998 to 2001 and then was a Matco district manager until November of 2005. Starting in late 2005, Scott W. Paavo, Sr. and his wife, Robin Paavo, became independent dealers of Cornwell Tools, and both were parties to the Cornwell dealer agreements. Scott Paavo, Sr. was primarily the salesperson, and Robin Paavo handled the financial end of the business such as banking, payment of bills, and working with their accountant.

2

On October 12th, 2005, Scott W. Paavo, Sr. formed Scott Paavo, Authorized Dealer of Cornwell Tools, LLC.

In June 2007, Scott W. Paavo, Sr. became a Cornwell district manager in Florida. In January 2008, Scott W. Paavo, Sr[.] returned to Michigan, and the Paavos became a Cornwell special representative dealer with a territory running north and west from Tawas City along Lake Huron.

On [January] 18, 2008, the Paavos entered into a special representative dealer franchise agreement. In order to be granted a special representative franchise, the Paavos were required to submit a credit application. The credit application requested asset and liability information. The Paavos disclosed the following liabilities on their credit application: Citi Mortgage, $195,000; Fifth Third Bank, $20,000; Fifth Third Bank, $7,000; and National City Bank, $16,000. The Paavos listed total assets valued at $408,200 showing a net worth of $170,000.

On January 18, 2008, the Paavos [also] entered into a dealer purchase order note and security agreement under which the Paavos received $35,000 of inventory, wholesale value. Under the terms of the dealer purchase order, note, and security agreement, if the Paavos maintained certain purchase levels and/or recruited up to three new dealers in a 36-month period, that indebtedness would be considered paid in full and the note canceled.

In February 2008, the Paavos began to operate their special representative dealership. The Paavos' performance through 2008 was generally satisfactory to Cornwell. This is Cornwell's own admission in its pleadings. Scott W. Paavo, Sr. stated that during 2008 he had annual gross receipts in the approximate amount of $200,000, and that figure was gross, not net.

Subsequently, Scott W. Paavo, Sr. proposed that his son, Scott Paavo, Jr., be made a Cornwell dealer in a portion of Scott W. Paavo, Sr.'s territory with the addition of territory to the south along Lake Huron. The territory, including the cargo air carrier, Kallita Air, which was once part of Scott W. Paavo, Sr.'s territory would not be part of Scott W. Paavo, Jr.'s territory.

In an addendum to [the] franchise dealer agreement, franchise dealer's territory, dated January 15th, 2009, Scott W. Paavo, Sr. stated, "Kallita Air is closing and won't be in this route[.]" Kallita

3

Air did not close[,] but instead reduced its size substantially, and substantially fewer mechanics were working at Kallita [Air], therefore reducing the number of tools that were needed by that and reducing the number of tools that could be sold to Kallita Air by [the Paavos].

With his son taking over much of his prior route, Scott W. Paavo, Sr. was then to establish a new territory north of Detroit in which Cornwell did not have a strong presence. On January 21, 2009, Cornwell . . . entered into a franchise agreement with Scott W. Paavo, Jr. On that same day, Scott W. Paavo, Jr. entered into a dealer purchase order note and security agreement. The arrangement was that Scott W. Paavo, Jr. would take a loan from Cornwell to fund the purchase of Scott W. Paavo, Sr.'s time payment accounts related to the routes that Scott W. Paavo, Jr. was taking over from his father.

On the weekly [report] provided by Cornwell to the Paavos dated February 12th, 2009, the Paavos received a special representative credit for establishing Scott W. Paavo, Jr. as a dealer in the amount of $12,000.[1]

From January 1, 2009, through March 19th, 2009, the Paavos purchased $21,550 of inventory from Cornwell. From March 19th, 2009, through May 29–or May 28th, 2009, the Paavos purchased $4,950 in inventory from Cornwell. The Paavos average purchase was about $1,260 per week compared to a national average of $2,800.

In February 2009, Robin Paavo purchased a new computer from Dell.[2] In April of 2009, the truck computer crashed and was put in the garbage. . . . Scott W. Paavo, Sr. testified at a deposition taken by the plaintiff that he loaded what information he could into the new computer from his memory or from records that his customers might have given him. He did not attempt to transfer any information from the old computer to the new one. The [Paavos] destroyed all of their [non-tax related] paper financial records in early 2009.

---

[1] The weekly reports are a record of the Paavos' weekly purchases, sales, accounts receivable and inventory. Every week the Paavos faxed a weekly report to Cornwell. Cornwell also provided the Paavos with weekly reports. The weekly statements show a detailed amount of inventory purchases and sales.

[2] The Paavos used the computer to generate weekly reports for Cornwell.

4

On May 20th, 2009, the Paavos formed Monster Tools, LLC. On May 27th, 2009, Cornwell . . . sent a letter to Scott W. Paavo, Jr. terminating his Cornwell franchise agreement on the grounds of route abandonment because Scott W. Paavo, Jr. had returned his tools he had received from Cornwell on May 14th, 2009. Scott W. Paavo, Jr. left owing Cornwell approximately $17,600.

On May 27th, 2009, Cornwell Tools [also] sent . . . the Paavos, a letter notifying them that Cornwell was terminating their Cornwell special representative franchise dealer agreement for the following reasons, "failure to pay as agreed for merchandise delivered by Cornwell in the amount of $3,014.68, and failure to maintain the inventory purchase levels required in the agreement. In 2009, you purchased $26,506.51 with an year-to-date weekly purchase average of $1,325.33 through week Number 20 of this year while the required minimum purchase average through week Number 20 was $2,266.80[.]" . . . The Paavos' termination was to be effective as of July 2nd, 2009, unless the Paavos were able to bring their account current and make the required additional purchases.

On August 20th, 2009, the Paavos filed a voluntary petition for bankruptcy protection under Chapter 7 of Title 11 of the United States Code. On November 30th, 2009, Cornwell filed its adversary complaint alleging the denial of [the Paavos'] debt . . . under 11 U.S.C. § 523(a)(2)(A) [, §727(a)(2), and § 727(a)(3)]. On December 29th, 2009, the [Paavos] filed an answer to [Cornwell's adversary] complaint.

On May 13, 2010, [Cornwell] filed a motion for summary judgment and for amendment of the pleadings to conform to evidence. In the motion for amendment of the pleadings to conform to evidence, [Cornwell sought] to amend its [adversary] complaint to add statutory grounds for the denial of [the Paavos'] general discharge under 11 U.S.C. § 727(a)(5), and the denial of a discharge of [the Paavos'] debt to [Cornwell] under 11 U.S.C. § 523(a)(2)(B).

The action for the denial of the discharge of [the Paavos'] debt to [Cornwell] under [§] 523(a)(2)(A), fraud in the inducement, and (B), fraud in writing, arises from [the Paavos'] failure to pay [Cornwell] $35,000. That's the wholesale value of inventory that [Cornwell] advanced to [the Paavos]. . . .

The [§] 523(a)(2) fraud in the inducement claim is based on [the Paavos'] alleged misrepresentations . . . regarding their son's

5

involvements of the business and representations regarding Kallita Air. [Cornwell] also allege[d] that [the Paavos] concealed from [Cornwell] that they intended to operate the dealership as an LLC. [Cornwell argued] that these misrepresentations were intentional and that they induced [Cornwell] to advance tools to [the Paavos], [Cornwell] relied on these misrepresentations, and that those misrepresentations were the proximate cause of [Cornwell's] loss.

[Cornwell] also [moved] for denial of the discharge of [Paavos'] debt to [Cornwell] under [§] 523(a)(2)(B). The [§] 523(a)(2)(B) claim is based on [Cornwell]'s claim that a credit application submitted to Cornwell in January of 2008 was materially false because [the Paavos omitted] substantial liabilities.

In the alternative, [Cornwell] [moved] for denial of the [Paavos'] general discharge under 727(a) . . . on the grounds that [the Paavos] transferred all of their inventory of Paavo, LLC, to Monster, LLC, within a year of filing their bankruptcy petition.

[Cornwell] also [sought] denial of the [Paavos'] general discharge under 727(a)(3) for unjustified destruction of documents and [moved] for denial of [the Paavos'] general discharge under 727(a)(5), which is the failure to explain a loss of assets prior to the filing of a bankruptcy.

The bankruptcy court set Cornwell's motions for hearing on June 29, 2010. Cornwell's Michigan counsel and the Paavos, *pro se*, appeared. The bankruptcy court issued an oral ruling from the bench during the hearing. It denied Cornwell's motion for summary judgment on Cornwell's § 523 claims, and granted *sua sponte* summary judgment in favor of the Paavos on these claims. The bankruptcy court also denied Cornwell's motion to amend as to the § 523(a)(2)(B) claim and granted the motion to amend as to the § 727(a)(5) claim. The bankruptcy court found that there were questions of fact as to Plaintiff's claims under 11 U.S.C. § 727(a)(2), (a)(3), and (a)(5). These § 727 claims were tried before the bankruptcy court on November 29, 2010. The bankruptcy court received post-trial submissions. On February 14, 2011, after reviewing the record, the bankruptcy

court issued a written opinion dismissing Cornwell's adversary proceeding. On February 15, 2011, the bankruptcy court issued an order discharging the Paavos. Cornwell then filed the instant appeal.

Cornwell raises four issues on appeal for this Court to review:

> (1) Did the bankruptcy court commit reversible error by granting summary judgment *sua sponte* and dismissing Cornwell's 11 U.S.C. § 523 claims, without prior notice or the opportunity to respond?

> (2) Did the bankruptcy court commit reversible error by denying leave to amend Count III of the Adversary Proceeding Complaint to add a cause of action under 11 U.S.C. § 523(a)(2)(B)?

> (3) Did the bankruptcy court commit reversible error by dismissing the Adversary Proceeding Complaint?

> (4) Did the bankruptcy court commit reversible error by granting a discharge to the Paavos?

## II.  STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo. Behlke v. Eisen (In re Behlke),* 358 F.3d. 429, 433 (6th Cir. 2004). As stated by the Sixth Circuit in *In re Wright Enterprises,* 77 Fed. Appx. 356, 363–64, 2003 WL 22331997 (6th Cir. 2003) (emphasis in original), the review of a bankruptcy court's decision regarding a motion for summary judgment is conducted under the *de novo* standard:

> The present case, as an appeal of the bankruptcy court's grant of summary judgment, does not involve "findings of fact" that are reviewed under a clearly erroneous standard. *See, e.g., Silverstein v. United States,* 419 F.2d 999, 1001 n. 3 (7th Cir. 1969) ("The government's brief argues-in support of the district court's reasoning with respect to the nature of the transaction-in terms of 'findings,' and seeks application by us of the 'clearly erroneous' rule to these 'findings.' Since the judgment was summary, the 'clearly erroneous' rule is inapplicable. We take the alleged 'findings' to be subordinate conclusions of law."); *see also Lemelson v. TRW, Inc.,* 760 F.2d 1254, 1260 (Fed.Cir. 1985) ("In the appeal of a grant of summary judgment, such factual inferences as are material to the grant are not reviewed under the clearly erroneous standard, as if they were findings of fact made following a trial of issues."). Rather, a court of appeals reviews a decision to grant

summary judgment *de novo. Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 521 (6th Cir. 1997). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©. Generally, the burden is on the moving party to show that no genuine issue of material fact exists. *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 861 (6th Cir. 1986). However, the moving party does not necessarily have to produce evidence showing the absence of a genuine issue of material fact. Instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the . . . court—that there is an absence of evidence to support the nonmoving party's case." C*elotex Corp. v. Catrett, 4*77 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In summary judgment the facts as well as any inferences that can be drawn from them must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 4*75 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.  ANALYSIS

### A.  DISMISSAL OF CORNWELL'S 11 U.S.C. § 523 CLAIMS

### 1.  No Reversible Error, Either Procedurally or Substantively, by Granting Summary Judgment *sua sponte*

Cornwell asserts that the bankruptcy court committed reversible error by *sua sponte* dismissing Cornwell's § 523(a)(2)(A) and § 523(a)(2)(B) claim. With respect to whether the bankruptcy court could *sua sponte* grant summary judgment in favor of the Paavos on Cornwell's claims, according to the United States Supreme Court, a court may enter summary judgment *sua sponte* in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir. 1998). Indeed, this principle is now recognized in Rule 56(f), which mandates that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f).

If a court, however, grants summary judgment *sua sponte* and without notice, the Sixth Circuit applies two separate standards in reviewing the court's decision. *See Salehpour*, 159 F.3d,

8

at 203.  One standard of review is applied to the procedural decision to enter summary judgment *sua sponte*, and another standard of review governs the substance of the decision to grant summary judgment.  *See Emp'rs Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995).

In reviewing the procedural decision of a court, noncompliance with Fed. R. Civ. P. 56 deprives the court of authority to grant summary judgment *sua sponte*, unless the losing party suffers no prejudice.  *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978).  Prejudice is determined by analyzing whether the losing party had an opportunity to address the court or whether the legal issue was already fully briefed.  *See Harrington v. Vandalia-Butler Bd. of Ed.*, 649 F.2d 434,  436 (6th Cir. 1981).  The Court reviews the procedural decision of the court to grant summary judgment for an abuse of discretion. *See Emp'rs Ins. of Wausau,* 69 F.3d at 105.

As to a court's substantive decision to grant summary judgment *sua sponte*, summary judgment motions in bankruptcy adversary proceedings, as is the case here, are governed by Fed. R. Civ. P. 56.  *In re Rowell*, 359 F. Supp. 2d at 647 (citing Fed. R. Bankr. P. 7056).  Rule 56 allows a district court to dismiss a case on summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The Court reviews the substantive merits of the bankruptcy court's decision to grant summary judgment *de novo*.

### a.  *No Procedural Error in Granting Summary Judgment* **Sua Sponte**

The bankruptcy court's failure to provide notice to Cornwell before *sua sponte* entering summary judgment in favor of the Paavos on Cornwell's § 523(a)(2)(A) and § 523(a)(2)(B) claim

9

was not an abuse of discretion and does not require reversal.  While the bankruptcy court provided no notice of its intention to dismiss the claims, no prejudice resulted to Cornwell under this Circuit's legal precedent as it had the opportunity to argue and brief why its § 523 claims should be summarily granted in its favor.  *See In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) (finding *sua sponte* entry of summary judgment was appropriate because the parties fully briefed the determinative issue and the losing party had conceded that there were no facts at issue); *cf. Moisenko v. Volkswagenwerk Aktiengesellschaft,* 198 F.3d 246, 1999 U.S. App. LEXIS 29998, *20 (6th Cir. 1999) (unpublished opinion) (finding prejudice because the losing party had no opportunity to be heard on the merits, brief the issue of whether a genuine dispute of fact existed, or argue the issue of whether a genuine dispute of fact existed).

Cornwell submitted its written motion and brief setting forth its arguments with respect to its § 523 claims.  Cornwell also filed a reply brief to the Paavo's response.  Furthermore, while the bankruptcy court was not overly receptive of Cornwell's arguments at the June 29, 2010, hearing, Cornwell had the opportunity to argue them.  Cornwell also presents to this Court no new arguments that it was foreclosed from raising before the bankruptcy court due to the bankruptcy court's decision.  *See Meyer v. AmerisourceBergen Drug Corp.*, 264 Fed. Appx. 470, 479 (6th Cir. 2008) (finding that the losing party suffered no prejudice when it had fully briefed the issues in its motion for summary judgment and pointed to no new arguments that it was prevented from raising to the court because of the court's *sua sponte* entry of summary judgment).  Accordingly, the Court does not find that the bankruptcy court abused its discretion.

10

### b. *No Substantive Error in Granting Summary Judgment* **Sua Sponte**

In reviewing the bankruptcy court's decision, the bankruptcy court correctly granted summary judgment in favor of the Paavos on Cornwell's § 523(a)(2)(A) and § 523(a)(2)(B) claims. 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B) provide:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>
> * * *
>
> (2) for money, property, services, or any extension, renewal, or refinancing of credit, to the extent obtained by–
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [and]
>
> (B) use of a statement in writing–
>
> (I) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2).

As to Cornwell's § 523(a)(2)(A) claim, Cornwell failed to provide sufficient evidence to create a genuine dispute of material fact that the Paavos obtained an initial $35,000 of inventory from Cornwell, or any additional inventory, by false representations or fraud. The bankruptcy court correctly held that the fact that the Paavos did not list the Scott Paavo, Authorized Dealer of Cornwell Tools, LLC ("Paavo LLC") on the special representative dealer agreement, the dealer

11

purchase order note and security agreement or the credit application on January 18, 2008, was not

a misrepresentation under § 523(a)(2)(A).  As the bankruptcy court pointed out, the Paavo LLC had

been formed in October of 2005.  The Paavos operated their original dealer agreement with

Cornwell through the Paavo LLC.  Cornwell produced no evidence that the Paavos would believe

when entering the special representative dealer agreement they would be required to disclose the

Paavo LLC when they had already operated as a Cornwell dealer without disclosing it in 2005.

As to the creation of Monster Tools, LLC, the evidence indicates that it was created on May

20, 2009, and the last purchase of inventory from Cornwell occurred around April of 2009.  Thus,

the bankruptcy court correctly found, as this Court does, that Cornwell did not provide inventory

to the Paavos based on fraudulent misrepresentations or fraud regarding Monster Tools, LLC, as it

did not yet exist.

The bankruptcy court also correctly held that there is no evidence that the Paavos intended

to cease their business after they received the inventory in 2008 or when Scott Paavo Jr. was granted

a franchise in 2009.  The communications between Cornwell and the Paavos conform to the typical

business model of a Cornwell tool dealer.  The Paavos also testified their actions regarding Cornwell

were always done in good faith.  It was also undisputed that Cornwell was satisfied with the Paavos

operation of its dealership in 2008.  Furthermore, the Paavos' special representative dealership was

not terminated until April of 2009—a year and four months after the Paavos and Cornwell entered

into the special representative agreement.  Thus, there is no genuine dispute of fact that the Paavos

had a good faith intent to operate the special representative dealership and Scott Paavo Jr.'s new

franchise.

12

Cornwell also raises an argument that relates to both of Cornwell's § 523(a)(2) claims. Cornwell asserts that the bankruptcy court found genuine disputes of fact as to Cornwell's § 727 claims on facts that are related to Cornwell's § 523(a)(2) claims and thus, the bankruptcy court erroneously dismissed Cornwell's § 523(a)(2) claims. The Court disagrees. The bankruptcy court noted genuine disputes of fact as to whether the Paavos' transferred inventory received from Cornwell to Monster Tools, LLC or hid such inventory in Monster Tools, LLC. The bankruptcy court also noted genuine disputes of fact as to whether the Paavos' intentionally destroyed their financial records to prevent Cornwell from tracking the inventory provided to the Paavos. Based on these genuine disputes of fact, the bankruptcy court set Cornwell's § 727 claims for trial.

These factual disputes, however, are separate and distinct from Cornwell's § 523(a)(2) claims . First, the Paavos' alleged intent to hide Cornwell's assets in Monster Tools, LLC is distinct and unrelated to the bankruptcy court's finding as to the § 523(a)(2) claims that Cornwell could not have relied on the Paavos' formation of Monster Tools, LLC to extend them inventory, since Monster Tools, LLC did not yet exist. The Paavos formed Monster Tools, LLC after Plaintiff initially received inventory from Cornwell in 2008 and after the Paavos' final purchase of inventory from Cornwell in approximately April of 2009. Second, the Paavos' alleged intent to destroy their computer and paper records to prevent Cornwell from tracking its inventory under § 727 is unrelated to the bankruptcy court's finding as to the § 523(a)(2) claims that no reasonable jury could find that the Paavos' fraudulently induced Cornwell to provide the Paavos inventory at any time through either statements or written documents. Accordingly, the Court finds that the bankruptcy court did not err in dismissing Cornwell's § 523(a)(2) claims.

13

**2. No Reversible Error by Denying Leave to Amend to Add a  § 523(a)(2)(B) claim**

As to Cornwell's § 523(a)(2)(B) claim, Cornwell also argues that the bankruptcy court erroneously denied amendment of its complaint to add a § 523(a)(2)(B) claim.  The Court disagrees with Cornwell.  The bankruptcy court was not erroneous in denying Cornwell's amendment as futile. Cornwell essentially argues that over $100,000 of obligations disclosed on the Paavos' Schedule F when they filed their bankruptcy petition was omitted from the Paavos' credit application in January of 2008.  Had Cornwell been aware of these obligations, it contends it would not have entered into the special representative dealer agreement with the Paavos.  Cornwell attempts to cast doubt on the bankruptcy court's holding that Cornwell failed to produce evidence that it relied on the Paavos' credit application in entering into the special representative dealership agreement by pointing this Court to paragraph 11 of the Affidavit of Bobbi Jo Templeton.  Templeton is the Wholesale Credit Manager of Cornwell.

Paragraph 11 of Templeton's Affidavit states that Cornwell would not have entered into the special representative dealership with the Paavos had the over $100,000 of undisclosed debt been disclosed.  Cornwell's argument, however, is fatally flawed.  Cornwell provides no evidence that the over $100,000 of debt that the Paavos disclosed on their Schedule F in 2009, and not disclosed on their credit application in 2008, actually existed at the time the Paavos submitted their credit application to Cornwell in January of 2008.

Specifically, Cornwell identifies the following purportedly undisclosed obligations by providing this Court with the Paavos' Schedule F.  The relevant accounts are as follows:

14

| Creditor's Name | Date Account Opened | Date of Last Activity | Amount of Claim |
|---|---|---|---|
| Amex (Act. No. 8713) | 12/01/2007 | 11/14/2008 | $10,421.00 |
| Amex (Act. No. 8893) | 12/01/2007 | 1/16/2009 | $9,599.00 |
| Amex (Act. No. 9313) | 12/01/2007 | 5/01/2009 | $2,029.00 |
| Bank of America (Credit Card) | 5/01/2003 | 4/01/2009 | $24,808.00 |
| Bank of America (Line of Credit) | 1/01/08 | 04/01/2009 | $21,926.00 |
| Citi | 5/23/2001 | 12/12/2005 | $12,068 |
| Home Depot | 2008 | | $4,252.19 |
| Hsbc Bank (Credit Card) | 1/01/2006 | 3/01/2009 | $10,138.00 |
| Hsbc/Arvtn (Charge Account) | 12/01/2003 | 3/01/2009 | $6,737.00 |
| Sears/Cbsd | 4/01/2004 | 1/12/2009 | $4,637.00 |
| Thd/Cbsd | 5/01/2006 | 1/26/2009 | $5,299.00 |
| | | **TOTAL:** | $111,914.19 |

As the bankruptcy court determined, Cornwell fails to produce any evidence that the Paavos' owed these debts at the time they submitted the credit application to Cornwell. As the dates regarding the opening and last activity on each account indicate, many of the accounts existed for a period of several years. There is no indication, however, on the Schedule F that the amount listed under the "Amount of Claim" column existed at the time the accounts were opened or in January of 2008 when the Paavos submitted the credit application. Additionally, there is no evidence that the Paavos did not list any of the obligations, assuming any did exist in January of 2008, with the intent to deceive Cornwell. As such, the Court finds that the bankruptcy court's denial of Cornwell's amendment of his ancillary complaint to add a claim under 523(a)(2)(B) was accurate.

15

**B.    NO REVERSIBLE ERROR BY DISMISSING CORNWELL'S COMPLAINT AND GRANTING DISCHARGE TO THE PAAVOS ON CORNWELL'S 11 U.S.C. § 727(A) CLAIMS[3]**

Pursuant to 11 U.S.C. § 727:

> (a) The court shall grant the debtor a discharge, unless–
>
> * * *
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>>
>> (B) property of the estate, after the date of the filing of the petition;
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> * * *
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727.

---

[3]  Because Cornwell's third and fourth issues raised before this Court contain overlapping arguments and require similar legal analysis, the Court has combined review of Cornwell's third and fourth issues under this section.

Cornwell asserts that the bankruptcy court erroneously dismissed its claims pursuant to 11 U.S.C. § 727(a)(2), (a)(3), and (a)(5). Cornwell's arguments are based on two grounds: (1) the bankruptcy court ignored undisputed evidence and (2) the bankruptcy court relied on evidence outside of the record.

**1. Bankruptcy Court Properly Considered All Evidence**

Specifically, Cornwell argues that the bankruptcy court ignored undisputed evidence concerning (a) Tech Credits against the Paavos' account with Cornwell; (b) the Paavos' payments to Cornwell in 2009; (c) the Paavos' own records showing substantial inventory in their possession when they formed Monster Tools, LLC, terminated from Cornwell, and when the Paavos later filed for bankruptcy; (d) the profit margin on the Paavos' tool sales; (e) the Paavos' role in creation of the Detroit territory; (f) the timing of the destruction of the computer and paper records; and (g) whether the Paavos "quit" Cornwell and started their independent business before being terminated.

*a. Tech Credits against the Paavos' Account*

Cornwell asserts that the bankruptcy court erroneously concluded that $100,000 in Tech Credit was not income to the Paavos. The Court finds that Cornwell's argument lacks merit as the bankruptcy court merely found that the $100,000 of customer purchases were financed by Cornwell, which explained the discrepancy between the approximate $360,000 of inventory sold by the Paavos and the $200,000 to $250,000 in payments they actually collected from the inventory sales. Furthermore, Cornwell fails to cite to any evidence that indicates $100,000 of cash assets were concealed by the Paavos. Thus, the bankruptcy court's finding was correct.

17

### b.  Paavos' 2009 payments to Cornwell

Cornwell argues that the bankruptcy court incorrectly concluded that the Paavos "paid" Cornwell $23,491.83 for inventory as indicated in a chart in the bankruptcy court's opinion. Cornwell asserts that the bankruptcy court failed to consider that $4,900 of the payments were "special representative credits," not cash, and approximately $8,000 was Tech Credit funding.  The Court does not find that the bankruptcy court's expense chart in its opinion is clearly erroneous. While Cornwell asserts that the Paavos never paid Cornwell this amount in cash, the bankruptcy court never stated that the full amount of $23,491.83 was paid by the Paavos to Cornwell in the form of cash.  The bankruptcy court appears to have merely summarized the income and expenses for 2009 to arrive at a net loss of $8,790.41.  As such, Cornwell fails to show how the bankruptcy court's finding is clearly erroneous.

### c.  Assets of the Paavos' LLCs

Cornwell argues that the bankruptcy court erroneously found that the Paavos had no inventory in their limited liability companies at the time of filing the bankruptcy petition.  Cornwell asserts that the bankruptcy court disregarded the weekly statements showing that the Paavo LLC and Monster Tools, LLC did have inventory when the Paavos formed Monster Tools, LLC, terminated their relationship with Cornwell, and when they filed for bankruptcy.  The Court does not find that the bankruptcy court's finding is clearly erroneous.

While the bankruptcy court acknowledged the weekly reports indicating the amounts of inventory, the bankruptcy court found based on the Paavos' testimony at trial that the inventory had been sold off.  The Paavos stated on the record that any inventory from Cornwell they possessed in January of 2009 was sold, and the sale proceeds paid the Paavos' current expenses.  The Paavos

18

further testified that because they had no inventory they had to purchase inventory from Integrated Supply Network, Inc. ("ISN")for their new business Monster Tools, LLC.  The bankruptcy court found the Paavos' testimony credible regarding the disposition of this inventory.  The bankruptcy court also found that the Paavos' testimony that they sold off the Cornwell inventory was further supported by the fact they had to purchase additional inventory from ISN for Monster Tools, LLC.  As the bankruptcy court correctly noted, it was unlikely that the Paavos would buy new inventory from ISN if they had transferred any remaining Cornwell inventory to Monster Tools, LLC.

The Court finds that Cornwell's assertions are mere speculation based off of mathematical projections unsupported by the record.  The bankruptcy court was not clearly erroneous in crediting the Paavos' testimony as to the existence of inventory and finding that the Paavos did not understate their income or conceal or transfer assets with the intention to hinder, delay or defraud Cornwell.

### d.  Paavos' Gross Profit Margin

Cornwell argues that the bankruptcy court erroneously applied a 35% profit margin to the Paavos' sales.  The application resulted in a showing that the Paavos had little income.  According to Cornwell there is no basis in the record for the bankruptcy court's finding.  The bankruptcy court's finding, however, is not clearly erroneous.  As Cornwell admits in its brief and the bankruptcy court noted, the exact profit margin on inventory sold was unclear.  Due to the lack of clarity, the bankruptcy court relied on the Paavos' testimony that they frequently sold inventory at a discount and Scott Paavo, Sr.'s testimony that he expected a 35% profit margin to find that the Paavos had approximately a 35% profit margin on their sales.  Because the record is unclear as to a profit margin different than 35% and the bankruptcy court's use of a 35% profit margin is

supported by the record, the Court does not find that the bankruptcy court's finding is clearly erroneous.

### e.  Scott Paavo, Sr.'s Role in Creating the Detroit Territory

Cornwell asserts that there was conflicting testimony between Scott Paavo, Sr. and his former District Manager, Larry Maas, regarding who "surveyed" the Detroit territory to determine the number of available customers.  Cornwell then concludes that the bankruptcy court was incorrect in concluding in its opinion that Scott Paavo, Sr. had "signed" the survey for the Detroit territory, but failed to mention that Scott Paavo, Sr. was involved in surveying the Detroit territory.

The Court finds Cornwell's assertion unconvincing.  First, Cornwell fails to identify how not stating whether Scott Paavo, Sr. surveyed the Detroit territory is relevant to Cornwell's §727 claims.  Second, the bankruptcy court did find that Scott Paavo, Sr. signed the survey, which Cornwell does not dispute as an erroneous finding.

### f.  The Timing of the Destruction of the Computer and Paper Records

Cornwell argues that the bankruptcy court's finding that the Paavos' destruction of their computer and papers records had been done in good faith to protect the private information of their customers is clearly erroneous based on the undisputed evidence.  Specifically, Cornwell points to the following timing of events that is allegedly contrary to the Paavos' testimony: (1) the Paavos started work in the Detroit territory in late January of 2009; (2) they purchased a new computer in January of 2009; (3) they quit Cornwell in April of 2009; and (4) the computer on the truck crashed in April of 2009.

The Court does not find that the bankruptcy court's reliance on the Paavos' testimony is clearly erroneous.  While the new computer was purchased prior to the failing of the computer on

20

the truck, the testimony indicates that the Paavos were aware the computer on the truck was failing. The testimony at trial also indicates that once the computer failed, the Paavos were aware it still contained the personal information of their customers, including credit card numbers and social security numbers. Based on their testimony, the Paavos did not want this information to be disclosed, and thus, the computer hard drive was destroyed.

While an inference may be drawn from the timing of the events that questions the Paavos' intent, the bankruptcy court heard the Paavos' undisputed testimony and found that the Paavos' intent to secure their customers' personal information was their reason for destroying the hard drive. Further support is found in Robin Paavo's testimony regarding destruction of the paper records. The testimony at trial indicates that she destroyed any paper records containing personal information of customers. She, however, did not destroy any paper records she believed she needed for legal purposes or federal and state taxes. The testimony further demonstrates she attempted to produce to Cornwell all records in her possession during the bankruptcy proceeding. The testimony supports the bankruptcy court's finding. As such, the bankruptcy court was correct in concluding that the Paavos had no intent to destroy records so that they could deceive or defraud Cornwell

### g. Whether the Paavos quit Cornwell

Cornwell argues that the bankruptcy court "persisted in its mistaken view . . . that Cornwell had ended the relationship between the parties, rather than the other way around." Cornwell, however, cites to no point in the bankruptcy court's opinion where such a finding was made. Cornwell also fails to indicate to this Court the relevance of the bankruptcy court's finding, if such a finding was made by the bankruptcy court. Moreover, Cornwell fails to refute the evidence that on May 27, 2009, Cornwell sent a letter to the Paavos. The letter represents a formal notification

to the Paavos of the termination of the special representative agreement between the parties.  As such, the Court finds Cornwell's argument unpersuasive.

## 2.  Bankruptcy Court Did Not Erroneously Rely on Matters Outside of the Record

Cornwell also argues that the bankruptcy court's reliance on matters outside of the record was clearly erroneous.  Specifically, Cornwell identifies the bankruptcy court's: (1) reliance on the Trustee's report; (2) reliance on expenses after the Paavos filed their petition; (3) finding about the Paavos' tool sales in 2009; (4) reliance on the Paavos' accountant as the reason for misstatements on the Paavos' tax returns; (5) reliance on the absence of testimony regarding the sale of the Paavos' inventory in 2009; and (6) conclusion that any of the Paavos' revenue generated from the sale of inventory was offset by uncollectible accounts receivable.

In reviewing the bankruptcy court's findings in its written opinion, Cornwell's arguments are irrelevant and unsupported.  First, the portions of the bankruptcy court's opinion that Cornwell takes issue with are where the bankruptcy court noted a lack of evidence in the record to support Cornwell's claim.  Cornwell fails to cite any authority that the bankruptcy court was erroneous in supporting its findings by noting the lack of specific evidence in the record.  The burden of proving non-dischargeability under § 727(a) is upon Cornwell, as the party opposing the discharge of the Paavos' debt.  *Benich v. Benich (In re Benich)*, 811 F.2d 943, 945 (5th Cir. 1987); Fed. R. Bankr. P. 4005.  Thus, Cornwell had the burden to produce all the necessary evidence for the bankruptcy case to decide in Cornwell's favor.

Second, the mere fact that the bankruptcy court noted that certain testimony or evidence was not before it does not therefore mean that the bankruptcy court based its findings on matters outside of the record.  Third, the bankruptcy court issued its Opinion after accepting evidence and hearing

22

testimony at trial and reviewing post-trial submissions.  The bankruptcy court's decision to accept the Paavos' testimony as credible in light of the fact that contrary evidence was not shown was not clearly erroneous.

Fourth, while this Court has carefully reviewed the voluminous record submitted on appeal to address Cornwell's arguments, Cornwell often fails to support its arguments with specific cites in the record.  Cornwell also fails to include supporting case law for many of its arguments. Additionally, Cornwell fails to explain the relevance of the allegedly erroneous findings pursuant to 11 U.S.C. § 727(a).  One of the essential elements of Cornwell's § 727(a) claims is that the Paavos' understated their income, concealed assets, or destroyed records with the intent to defraud or deceive Cornwell.  Cornwell fails to show the Paavos' understated their income, concealed assets, or destroyed records with the intent to deceive Cornwell.  Cornwell merely provides speculation based on the financial records and timing of events.  The bankruptcy court, however, was not clearly erroneous in accepting the Paavos' justifications for their actions.  Based on this testimony and other evidence presented, the bankruptcy court correctly concluded that Cornwell's § 727 claims failed.

Cornwell also argues that it was an error as a matter of law to dismiss the § 727(a)(2) claim on the finding that Cornwell failed to allege the Paavos' concealment or transfer of income in 2008 was intended to avoid the payment of creditors.  Cornwell's claim is overstated.  The bankruptcy court's dismissal of Cornwell's § 727(a)(2) claim involved extensive analysis of the record.  As to the specific portion cited by Cornwell, the bankruptcy court stated:

> "More importantly, even if Plaintiff's allegations that Defendants have understated their income for 2008 is true, it is not relevant to proving nondischargeability under 11 U.S.C. § 727(a)(2), unless Plaintiff can show that Defendants concealed or transferred income or assets to avoid the payment of creditors.  Plaintiff does not allege

23

that Defendants concealed or transferred income in 2008 to avoid the
payment of their creditors."

The following six pages of the bankruptcy court's opinion analyzed Cornwell's arguments, the

testimony of the Paavos, and the evidence produced to conclude that "[b]ecause there is nothing in

the record to demonstrate that Defendants took any action with the specific intent of harming

creditors, there are no grounds for denial of Defendants' general discharge under § 727(a)(2)."

While Cornwell did allege that the Paavos' understated their income in 2008, Cornwell fails to show

that the Paavos' did so with the intent to defraud Cornwell.  Thus, the bankruptcy court's dismissal

of Cornwell's § 727(a)(2) claim is not an error as a matter of law.  In sum, the bankruptcy court did

not erroneously rely on matters outside of the record.

Therefore, the uncontroverted evidence in the record allowed the bankruptcy court to

conclude, as this Court does, that dismissal of Cornwell's § 727(a)(2),(3), and (5) claims was

appropriate.

## IV.  CONCLUSION

Accordingly, and for the reasons set forth above, Cornwell's appeal is DENIED, and this

case is hereby DISMISSED.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

24

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: December 27, 2011

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on December 27, 2011.

S/Marie E. Verlinde
Case Manager
(810) 984-3290